And now, with respect to this case, may I please the Court, Jonathan Libby, appearing on behalf of Ismael Torres-Figueroa. Your Honors, this is an illegal reentry case. The district court surprised the defendants at the beginning of the sentencing hearing with this residency restriction, along with a couple of other sex-offense-related conditions. The defense objected to the conditions. It, I certainly would concede, was not a very specific objection, but clearly indicated that it was not appropriate, given the nature of the case, to impose the condition. The court gave no explanation whatsoever for why this condition was necessary here, and we would suggest that, certainly, at least on that point, the failure to give any explanation, any statement of reasons, in and of itself, warrants a remand so the Court can at least explain why it was necessary in this case. Was this one in the probation report or not? I mean, in the presentation report. No, Your Honor. The Judge Anderson does not release the probation officer's recommendation letter, so, therefore, the first time Mr. Torres heard about this was actually in the sentencing hearing. And he wasn't being prosecuted for any sex offense anyway. Correct. Correct. But this one has a slight different problem, which is that he's not legally in the United States anyway. Well, that's certainly true, Your Honor. Though the condition, for whatever reason, the Court felt the need to impose it. Now, if anything, perhaps that's another reason why the ---- Would it apply if he's deported? You mean to the foreign authorities? Not clear, Your Honor. Not clear. It's certainly in order of the Court, and I suppose if the Court decided it wanted to violate him for the condition, I suppose it could, even in a foreign country. He won't be here to, I suppose, face the violation hearing, but if probation wanted to, because he lived within 2,000 feet in a foreign country, I suppose it could. Again, it's not clear why it was necessary here. This is a fairly serious conviction for aggravated sexual assault of a child under the age of 14, but it was in 1994. Is there some time period that should be an automatic cutoff for consideration, or where do you draw the line as to when it should be a factor in determining a condition? Your Honor, I would not even suggest that there should be some specific cutoff time. I think courts have to look at the facts of a particular case and make a judgment in an individual case. In this case, however, you know, what's kind of interesting is Mr. Schwartz, in fact, does dispute the facts surrounding that offense. He disputes that he, in fact, ever engaged in that activity. How many sexual assault clients have you represented that admitted they did it? Well, he does not – I take your point, Your Honor. He does not contest the fact that the conviction took place. But there, in fact, and we submitted this, or it was submitted below, the fact that, you know, he did not have an interpreter at the hearing. He did not understand what was going on. He immediately requested after the sentencing hearing in that case for a DNA test. He was told that he couldn't get a DNA test because the sample had already been destroyed. So he, for a long time, has been contesting this. And the fact is the Court does not seem to have taken that into account, certainly never resolved that dispute, in fact, as to whether or not it was necessary to impose this condition here. If he clearly did it, is it still too old? Well, I think, in this case, it very well may be too old, certainly. I mean, there certainly is a question, how far back do you want to go? And when you combine it with the fact that this is a deportable alien, you know, come November 1st, the Sentencing Commission, New Orleans, will go into effect, and they, in fact, say if you're going – for deportable aliens, the Court need not impose any supervised release conditions. So, again, the Sentencing Commission has even now said it's not appropriate, really, in these types of cases to impose this kind of conditions. And we would submit, you know, given the entire set of circumstances, and we don't know why the Court gave it here, that, you know, the Court should at least remand it. And if the Court then decides it doesn't even want to impose the conditions again, then it certainly can do that. It all seems – why should we be worrying about this, in the sense that, for the same reason why there's no reason to have the supervised release, there's also not a whole lot of reason to be fighting about it? Well, in terms of the fighting about it, you know, Mr. Torres wanted to appeal, and this is not an individual decision. I understand. But in terms of our – or to put it in the terms that it was put in the last case, I mean, this is speculative square in the sense that it seems extremely unlikely that he's ever actually going to be subject to this condition. Sure. I guess my concern, Your Honor, is should this case affirm it, then I can guarantee you the government will cite to this case, even if it's an unpublished decision, to say, see, this Court has affirmed a 2,000-foot residency restriction. So, you know, that is a concern here. It was imposed. If, facially, it's improper, then it shouldn't be imposed anywhere, even under these circumstances. And with that, I'll reserve the balance of my time. All right. Thanks. Hello again. Jean-Claude Andre, again, for the United States. I guess I'll start out with just addressing the distinctions between this case and the case we discussed earlier. Here, there was a, in my view, I will concede, something closer to an appropriate objection than in the prior case. But as we explained in our letter Monday night, we still think that the objection was insufficient to take it out of plain error review, because although the defendant objected basically on the grounds that this condition was not reasonably related to his offense of conviction, he never addressed the breadth or scope of the condition, which is what we're all talking about now. Well, but there is that issue, too. I mean, in this case, in my understanding, when you apply those Section 3553 factors, and you're talking about the nature of the offense, you're talking about the offense of conviction, not of past, old convictions. You're talking about what happened here. And this is a Section 1326 case. I don't see how the residential condition relates. The nexus between the nature of the current offense and the condition is a sufficient but not necessary requirement. Supervised release factors can be both backward and forward looking. In all cases, they're inherently forward looking. But as this Court recognized in B, you can look back at something in the defendant's past, even if it did not stick its head up in this particular case, and impose a condition to address that. Again, I think what's animating all of these cases is the fact that there are these modification procedures. So when someone gets out of custody, in this case it will be 30 months after his initial arrest, you can say, does that condition still make sense? And if it doesn't, then... Presumably, the conditions necessary to deal with his earlier offense should have been dealt with in the earlier conviction. Why does the district court in this case go back to the history of, especially such an old history, of earlier convictions and start imposing conditions, which are sort of like an additional sentence for the earlier case? Well, I think the district court is free to basically say, if I, or really my probation officer who works for me, is going to be supervising this individual, I need to take into account and be wary of all the ways in which this individual might... Doesn't it matter at least that with respect to this particular condition, which is a hugely onerous one, that it ought to be looked at a lot more skeptically when you're dealing not with this crime, but an almost 20-year-old crime? I don't think so. I think our district judges, at least they hear it a lot from our office, from the probation office, and from sex offender treatment providers, that someone with an interest in children, it's almost an addictive trait. It's almost an innate trait that you can't really cure, but you have to... He has no other convictions other than that one 17 in which he contests factually, and if what you're saying is true, you would assume you'd have some other arrests or charges or convictions following the 17-year-old one. Well, the defendant was in custody, I must say, for 15 years for that prior offense, so he hasn't been out that much and been that able to commit other sex offenses. But I guess it's also a credit to him that he has, or with the supervision he was receiving from Texas authorities or just with help from friends and family members, been able to not reoffend. So doesn't that feed directly into no more onerous than necessary? I don't, because I think the district court, when the district court is looking forward, can set a baseline and then basically say, come back to me when you're out and we'll see whether we need to dial it back. I must say that I don't remember ever seeing this before, but is this usual, that is, to go back into earlier crimes and set conditions, especially onerous ones that don't deal with the crime of conviction but are much earlier crimes, especially one that's really a serious condition? I never put them in those particular categories, but I certainly regularly see probation letters and then judgment and commitment orders come out where it's based exclusively on past conduct. But that's generally where we're talking about, like, drug abuse or alcohol addiction. It's not a one-time conviction, generally. This is really new. I've also seen in the violent crime context a condition prohibiting repeated violent crimes and prior convictions. What I was going to say, Your Honors, that I've actually seen in a violent case the probation office recommends and the court impose a condition barring the defendant from holding any identification documents relating to another because they had an I.D. theft prior. So I do see analogs to this quite regularly because I think that's what the probation office does. They look at the defendant's rap sheet and they say, okay, he has a prior, which would then trigger this bundle of conditions, and we'll recommend them. And then you get to district court, and in a case like this where there's, you know, where there's not a real pointed objection, then the district court goes ahead and imposes it. And with respect to the reasonably related objection the defendant did make, I think on that point the district court did address it. There was five pages of discussion between the district court and defense counsel about the nature of this defendant's prior offense. Judge Anderson didn't just say, objection noted, move on and impose it. He was keenly aware of the fact that this was an old prior, that the defendant, although he was unable to collaboratively attack it under Custis, none the less disagreed with the fact that he committed it. And Judge Anderson went ahead and decided to impose this anyways.  Kagan. Sotomayor.    Sotomayor. Kagan.    Kagan.    Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. And unlike the other cases, this defendant has a very short period of supervised release. Because this was a 1326 case, he's only under supervision for three years. So we're basically saying, like, I'd have to calculate his release date, but sometime between, you know, three and six years from now, he would have to somehow find a lawful way to come back in the United States, which I really can't imagine, in order to be subject to this condition. Kagan.          Kagan.            Kagan. is the only way he could get around his aggravated felonies. If that happens within the relevant timeframe, then this condition would come into play. So while it's very speculative, it's better to have it on the books now than to have the defendant show up lawfully, and then to try to increase his supervision by imposing at         Kennedy. Kennedy. Kennedy. Kennedy. Kennedy. Kennedy. Kennedy.     Kennedy. Kennedy. Is it necessary — isn't it the case though, that if he illegally re-enters in and of itself, it would be a violation? It would be, yes. It would be an additional allegation on which the court could violate him. Although I think that would be largely superfluous, because his illegal re-entry in and of itself would be a violation. But he would be in violation. Pardon me? That would increase the sentence, too. It could. I'd have to look at the grades I have. No, it would. It could. Because there would both be violations, but, I mean, it would — could increase         the sentence. Yeah, I agree.  Yes. So, I don't know that I could ever discuss that with the front office. I mean, certainly the chief of our appeal section is aware of it. Our PSC, Project Safe Childhood Coordinator, is aware of it. We've spoken with many other districts. I did do a moot before. Some main justice officials just — it happened to play out that way earlier this week. So, they're aware of it, but — Are other districts instituting — are the parole offices and other districts in the          I know for certain that the Western District of Washington is, and I know that the Eastern District of Virginia is, which they're not in the Ninth Circuit. But those are the two districts that immediately come to mind. There may be more. I just — Has your office ever been asked for a position in a district court about it, and have you supported it? We have never, as far as I know, and I do handle most of these cases, I have never seen kind of the objection of the kind that Mr. Libby is now making in district court. So, we have never had occasion to defend it. And I imagine we would ask for a lengthy continuance and start talking to experts and maybe try to put together the very study that even the FAM Court, the California Court of Appeals Court, looking at Jessica's law, was unable to find and noted that the parties had not presented. I guess that all goes back to my earlier point, which is why I think these are not good test cases for this condition, because if there is going to be review of this and a determination as to whether it's too restrictive or a banishment, it needs to happen organically. And because this is not a court for hindsight litigation, I don't think it should be sent back. So Red is the very first one, and we have it. As far as I know, there could be others. There could be other cases where it was, you know, recommended and I just didn't hit my desk. And actually, come to think of it, perhaps the Grigsby case might be a little bit older than the Rudd case. So that might actually have been the first one. But it did start coming up in between our plea agreement in Rudd and the Rudd recommendation letter. And I'll just clarify how I know that, because what we typically do when we negotiate supervised release conditions in sex offense cases is we email probation and say, what are you guys currently recommending? We then look at them. We see whether we think they're defensible. If we think they are, then that's what we will insert into the plea agreement. But you didn't insert it in Rudd. Pardon me? But you didn't insert it in Rudd. Right. We did not, because when we put it in the plea agreement, at the time, the probation office, the time we prepared the plea agreement, the probation office was using the condition upheld in Daniels, this court's decision in Daniels, which was a line-of-sight condition. And then sometime in between our plea agreement in Rudd and the probation office's April 2010 recommendation letter, probation got the idea, from where I literally don't know, to increase it to 2,000 feet. Any other questions? No. Okay. So let's submit United States v. Torres-Figueroa, and we'll...
judges: Whyte, Wardlaw, Berzon